UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * * * *

| | |
|---|---|
| GAYLE CHILES, an individual, and as guardian of JILLIAN CHILES; JILLIAN CHILES a minor by and through her Guardian GAYLE CHILES,<br><br>    Plaintiffs,<br><br>vs.<br><br>GARY UNDERHILL in his official and individual capacity; MIKE MIERAS in his official and individual capacity; ED SHEPPARD in his official and individual capacity; the WASHOE COUNTY SCHOOL DISTRICT; and DOES 1 through 10,<br><br>    Defendants. | 03:05-CV-0179-LRH (RAM)<br><br>ORDER |

Presently before this court is Defendants' Motion to Dismiss (#11)[1]. Plaintiffs have submitted an opposition (#17), to which Defendants subsequently replied (#19).

**FACTUAL AND PROCEDURAL BACKGROUND**

The present case arises out of an allegedly unlawful detention and arrest at Hug High School ("HHS"), a school within the Washoe County School District. The plaintiffs, Gayle and Jillian Chiles (collectively "Plaintiffs"), are one in a number of families who have resorted to legal action against Defendants Gary Underhill ("Underhill"), a HHS school police officer, Mike Mieras ("Mieras"), the Washoe County School District Chief of Police, Ed Sheppard ("Sheppard"), the Dean of Student Discipline at HHS, and the Washoe County School District

---

[1] All references to (#XX) refer to the court's docket.


1  ("WCSD") (collectively "Defendants"), to remedy alleged racial discrimination on the HHS
2  campus.
3      In this particular case, the lawsuit arises out of defendant Underhill's arrest of Jillian for
4  trespassing on the HHS campus. Plaintiffs have alleged the following facts in their complaint:
5      Jillian attended HHS. On March 15, 2005, she attended school in the morning. After
6  lunch Jillian returned to the HHS campus to use the Career Center to look for college
7  scholarships. Underwood noticed Jillian on campus and told her she was trespassing and that she
8  would be arrested if she did not leave campus. Jillian, after being denied permission to retrieve a
9  book from her locker, complied and left campus.
10     However, Jillian had made plans to spend time with her friends after school and she
11 returned to campus at the end of the school day. She entered the school parking lot, an area open
12 to the public, to meet her friends. After meeting up with her friends, and while sitting in a car
13 belonging to one of those friends, Jillian noticed Underhill staring at her. Jillian exited the car
14 and began to walk off the HHS campus.
15     Underhill began chasing Jillian. Jillian, to avoid Underhill, ran across the street to the
16 sidewalk across from the HHS campus. As she reached the sidewalk, Jillian turned around to
17 speak to Underhill. Underhill, who had taken chase of Jillian, tackled her and took her to the
18 ground as she turned around. He placed his knee on her neck, pinning her to the ground, and
19 handcuffed her so tightly that her hands turned blue. Underhill took Jillian back to the HHS
20 campus. He slammed her head on the hood of his police car and threw her to the ground. He
21 again placed his knee on her neck while another officer shackled her ankles and placed a velcro
22 wrap around her thighs. The officers then placed a hood over her head, making it difficult for
23 Jillian to breath, and placed her in the back of the police car. Jillian was arrested for trespassing
24 and taken to Juvenile Hall.
25     Jillian was suspended from school the same day she was arrested and was not to return
26 until April 13, 2005, a nearly one month suspension. Jillian did not have a formal hearing on her
27 suspension until April 18, 2005. In addition, Jillian contends that she was not informed of her
28 right to a hearing, or her right to appeal her suspension until after she retained counsel to pursue

her reinstatement.

## LEGAL STANDARD FOR MOTION TO DISMISS

In considering "a motion to dismiss, all well-pleaded allegations of material fact are taken as true and construed in a light most favorable to the non-moving party." *Wyler Summit P'Ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998) (citation omitted). However, a court does not necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations in plaintiff's complaint. *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994).

There is a strong presumption against dismissing an action for failure to state a claim. *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997) (citation omitted). "The issue is not whether a plaintiff will ultimately prevail but whether [he or she] is entitled to offer evidence in support of the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982). Consequently, the court should not grant a motion to dismiss "for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *see also Hicks v. Small*, 69 F.3d 967, 969 (9th Cir. 1995).

## DISCUSSION

Plaintiffs filed the present complaint alleging nine claims for relief: violation of their Fourth and Fourteenth Amendment rights through 42 U.S.C. § 1983; violation of Title VI, 42 U.S.C. § 2000d; violation of procedural due process through 42 U.S.C. § 1983; battery; false imprisonment; intentional infliction of emotional distress; negligent infliction of emotional distress; negligent supervision and training; and violation of administrative regulations. Defendants have sought to dismiss all claims except for those brought pursuant to Title VI.[2]

---

[2] Defendants have sought to dismiss the Title VI claim as it relates to the individual defendants and insofar as it seeks punitive damages. Plaintiffs have noted in their opposition that the claim is not against the individual defendants and does not seek punitive damages. Thus, Defendants' arguments on this point are moot and will not be discussed.

**A.     Federal Claims**[3]

*1.     42 U.S.C. § 1983*

Plaintiffs' first claim for relief, brought pursuant to 42 U.S.C. § 1983, alleges deprivations of their civil rights in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

*a.     Plaintiffs' Equal Protection Claim is Subsumed by Title VI*

In seeking dismissal of the first claim for relief, Defendants note that Plaintiffs' second claim for relief, based upon the same set of facts alleged for the constitutional claims, alleges that Jillian was discriminated against on account of her race in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.  Since the first two claims for relief are based upon the same set of facts, Defendants argue that Plaintiffs' section 1983 claim is subsumed by the Title VI claim and must be dismissed.

42 U.S.C. § 1983 supplies a cause of action to a plaintiff when a person acting under the color of law deprives that plaintiff of any "rights, privileges, or immunities secured by the Constitution and laws [of the United States.]"  However, "[w]hen the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983." *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 20 (1981).  In determining whether an act subsumes a section 1983 action, the court must determine whether Congress intended that act to supplant any remedy that would otherwise be available under section 1983. *Id*. at 21.  Such Congressional intent may be found directly in the statute creating the right or inferred when the statutory scheme is incompatible with individual enforcement under section 1983. *City of Rancho Palos Verdes, Cal. v. Abrams*, 125 S.Ct. 1453, 1458 (2005).  The defendant bears the burden of demonstrating that Congress has expressly withdrawn the section 1983 remedy. *Golden State Transit Corp. v*

---

[3] The federal claims in this matter are brought on behalf of Jillian Chiles.  Gayle Chiles has only alleged claims of Intentional Infliction of Emotional Distress and Negligent Infliction of Emotional Distress as direct actions on her behalf.  Thus, the term Plaintiffs refers in this section to Jillian Chiles and Gayle Chiles as Jillian's guardian only.

*City of Los Angeles*, 493 U.S. 103, 107 (1989).

The Ninth Circuit has not decided the specific issue of whether section 1983 is subsumed by Title VI. However, the Ninth Circuit has recognized the Supreme Court's *Sea Clammers* doctrine when construing other federal statutes and found that those statutes precluded a section 1983 remedy. *See, e.g.*, *Dittman v. California*, 191 F.3d 1020 (9th Cir. 1999); *Dep't of Educ., State of Hawaii v. Katherine D.*, 727 F.2d 809 (9th Cir. 1984). In addition, the District of Nevada has recognized that a section 1983 action is barred in the context of Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681 *et seq*. *Henkle v. Gregory,* 150 F.Supp.2d 1067 (D. Nev. 2001).

In the present case, this court is called upon to decide whether Title VI serves to bar an action brought pursuant to section 1983. While Title VI does not explicitly purport to limit section 1983 relief, 42 U.S.C. § 2000d, congressional intent to foreclose such a remedy can still be inferred from the creation of a comprehensive statutory scheme. *Sea Clammers*, 453 U.S. at 20. Therefore, the first question this court must decide is whether Title VI is sufficiently comprehensive to demonstrate the congressional intent to foreclose a section 1983 remedy. If Title VI is sufficiently comprehensive, the court must determine whether Plaintiffs' section 1983 claims seek to remedy conduct that is within the scope of Title VI. Only section 1983 claims that are within the scope of a comprehensive statutory scheme are subsumed by that scheme. *See Smith v. Robinson*, 468 U.S. 992, 1003 n.7 (1984) *superseded by* Education of the Handicapped Act*,* § 615(e)(4), as amended, 20 U.S.C. § 1415(e)(4).

The courts are split as to whether Title VI subsumes section 1983. The Seventh Circuit[4] and the Western District of New York[5] have found that Title VI is sufficiently comprehensive to preclude a plaintiff from bypassing its enforcement mechanisms through a section 1983 action.

---

[4]*Boulahanis v. Bd. of Regents*, 198 F.3d 633, 641 (7th Cir. 1999).

[5]*Bayon v. State Univ. of New York at Buffalo*, 2001 WL 135817, *3 (W.D.N.Y. 2001).

5

1  Conversely, The Third Circuit[6] and the First Circuit[7] have found that Title VI is not sufficiently
2  comprehensive. After examining the relevant case law and the statutory scheme of Title VI, this
3  court finds that Title VI is sufficiently comprehensive to evince congressional intent to foreclose
4  a section 1983 remedy.

5  As mentioned previously, this district has found that Title IX is sufficiently
6  comprehensive to foreclose a section 1983 remedy. *Henkle*, 150 F.Supp.2d at 1074. Title IX
7  was patterned after Title VI and is enforced and interpreted in the same manner as Title VI.
8  *Barnes v. Gorman*, 536 U.S. 181, 185 (2002) (citations omitted); *Alexander v. Sandoval*, 532
9  U.S. 275, 280 (2001) (citations omitted). As with Title IX, the court finds that Title VI contains
10  a comprehensive administrative enforcement scheme.[8] *See* 34 C.F.R. § 100.1 *et seq.*; *Henkle*,
11  150 F.Supp.2d at 1073.

12  Title VI's administrative scheme allows persons who believe they were discriminated
13  against to file a written complaint with the responsible department official. 34 C.F.R. § 100.7(b).
14  A complaint that indicates noncompliance with Title VI triggers a prompt investigation. 34
15  C.F.R. § 100.7(c). If the investigation reveals a failure to comply with Title VI, the department
16  will take steps necessary to ensure compliance. 34 C.F.R. §§ 100.7, 100.8, 100.9. Although
17  these regulations do not provide a monetary remedy for a complainant who was discriminated
18  against, the regulations do provide a process designed to effectuate compliance with Title VI. A
19  federally funded entity that does not comply with Title VI may ultimately lose its federal
20  financial assistance. 34 C.F.R. § 100.8. In addition to the administrative remedies, Title VI
21  contains an implied private cause of action through which individuals can obtain both injunctive
22  relief and damages. *Sandoval*, 532 U.S. at 279.

---

[6] *Powell v. Ridge*, 189 F.3d 387, 402 (3rd Cir. 1999) *overruled on other grounds by Alexander v. Sandoval*, 532 U.S. 275 (2001).

[7] *Cousins v. Sec'y of the United States Dep't of Transp.*, 857 F.2d 37, 44-45 (1st Cir. 1988) (indicating that Title VI remedies, sought pursuant to section 505 of the Rehabilitation Act of 1973, are not "so comprehensive as to indicate a congressional intent to foreclose alternate avenues of relief").

[8] In fact, Title IX relies on many of the provisions applicable to Title VI. 34 C.F.R. § 106.71.

An additional consideration in determining whether a particular statutory scheme should bar a section 1983 action, apart from administrative and private remedies, is whether that scheme provides a more restrictive private remedy for statutory violations than would otherwise be available pursuant to section 1983. *Abrams*, 125 S.Ct. at 1458. In the context of Title VI, the Supreme Court has recognized that the available remedies should sometimes be limited to declaratory and injunctive relief. *Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 595-97 (1983). Furthermore, a Title VI plaintiff can only seek recovery from the recipient of the federal funding. *Shotz v. City of Plantation*, 344 F.3d 1161, 1169-70 (11th Cir. 2003). In other words, individuals may not be held liable under Title VI. *Id*.

Given the fact that Title VI offers an administrative enforcement scheme, a private right of action and damages that are more restrictive than those available through section 1983, the court finds that a remedy under section 1983 for conduct within the scope of Title VI would be incompatible with Title VI. *See Abrams*, 125 S.Ct. at 1458. Title VI provides the exclusive mechanism for recovery to individuals who were discriminated against on the basis of race by any program or activity receiving federal financial assistance. *See* 42 U.S.C. § 2000d.

Although the court has concluded that Title VI subsumes a section 1983 remedy, the inquiry does not end here. The next question seeks to determine which section 1983 remedies are subsumed by Title VI. In *Henkle*, the court stated that the plaintiff could not bring a constitutional equal protection claim based upon the same facts as a Title IX claim. 150 F.Supp.2d at 1074. Relying on *Smith*, the *Henkle* court found that "it would be inconsistent to allow a plaintiff to circumvent [the Title IX] scheme by pursuing an equal protection claim under § 1983 based upon the same set of facts." *Id*. This inconsistency would result from allowing a plaintiff to bypass the scheme Congress created to remedy such violations. However, this reasoning is inapplicable where a plaintiff brings a cause of action pursuant to section 1983 to redress conduct that is outside the scope of the statutory scheme. *See Smith*, 468 U.S. at 1003 n.7 ("Claims not covered by the EHA should still be cognizable under § 1983, with fees available for such actions.").

In the case at bar, Plaintiffs' first cause of action alleges violations of the Fourth

Amendment and the Equal Protection Clause of the Fourteenth Amendment.  In order to determine whether these claims for relief are subsumed by Title VI, the court must determine whether Title VI proscribes the alleged conduct for which Plaintiffs are seeking relief.  Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

Plaintiffs' Equal Protection claim alleges that they were denied the same treatment as other students on account of their race.  The court finds that such allegations fall squarely within the conduct that Title VI was designed to remedy.  Title VI essentially proscribes conduct that would violate the Equal Protection Clause of the Fourteenth Amendment.  *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 287 (1978) ("Title VI must be held to proscribe only those racial classifications that would violate the Equal Protection Clause of the Fifth Amendment."). However, as previously discussed, the remedies available under Title VI are different than those that would otherwise be available pursuant to section 1983.  Because Congress enacted a statutory scheme sufficiently comprehensive to remedy racial discrimination committed by an entity receiving federal financial assistance, Plaintiffs cannot pursue a section 1983 remedy for the same conduct.

The court, however, reaches a different result with respect to Jillian's Fourth Amendment claims.  Jillian alleges that her detention and arrest was made without probable cause or reasonable suspicion and was effectuated through the use of excessive force.  The court finds that this claim is not subsumed by Title VI as Title VI was not intended to remedy instances of unreasonable seizures in violation of the Fourth Amendment.  Although Plaintiffs allege a discriminatory motive behind their arrests, the cause of action asserts a claim for unreasonable seizure rather than discrimination.

      b.     *Qualified Immunity*

After the foregoing discussion on whether claims brought under section 1983 are subsumed by Title VI, the court is left with the alleged Fourth Amendment violations against

1  Defendants.  Defendants note that the claims are brought in two distinct manners.  One set of
2  claims is against Defendant Underhill for his direct actions.  The second is against Defendants
3  Sheppard and Mieras under a supervisor liability theory.  Defendants then claim that all
4  defendants are entitled to qualified immunity.
5  　　　State officials are provided with a qualified immunity against section 1983 claims
6  "insofar as their conduct does not violate clearly established statutory or constitutional rights of
7  which a reasonable person would have known." *Spoklie v. Montana*, 411 F.3d 1051, 1060 (9th
8  Cir. 2005); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  This immunity is granted broadly
9  and "provides ample protection to all but the plainly incompetent or those who knowingly violate
10 the law." *Moran v. Washington*, 147 F.3d 839, 844 (9th Cir. 1998) (quoting *Malley v. Briggs*,
11 475 U.S. 335, 341 (1986)).
12 　　　In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court established a two-step
13 evaluation of qualified immunity, which has also been adopted by the Ninth Circuit.  *See, e.g.*,
14 *Johnson v. County of Los Angeles*, 340 F.3d 787, 791 (9th Cir. 2003); *Jackson v. City of*
15 *Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001).  The first step taken by the court is to make a
16 constitutional inquiry by determining the following issue: "based upon the facts taken in the light
17 most favorable to the party asserting the inquiry, did the officer's conduct violate a constitutional
18 right?" *Johnson*, 340 F.3d at 791 (citing *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th
19 Cir. 2001)); *Saucier*, 533 U.S. at 201.  If the court finds that the officer's conduct violated a
20 constitutional right, the second step of the *Saucier* analysis is that the court determine whether
21 the officer is entitled to qualified immunity.  *Johnson*, 340 F.3d at 791-92.  As part of its
22 qualified immunity analysis, the court should consider whether the law governing the conduct
23 was clearly established when the conduct occurred.  *Robinson v. Solano County*, 278 F.3d 1007,
24 1012 (9th Cir. 2001) (en banc).  If the right violated was clearly established, the court should also
25 decide "whether the officer could nevertheless have reasonably but mistakenly believed that his
26 or her conduct did not violate a clearly established constitutional right."  *Id*. at 201-02; *Saucier*,
27 533 U.S. at 201-05.
28 　　　The first step in the two-step process is intended to "set forth principles which will

become the basis for a holding that a right is clearly established." *Saucier*, 533 U.S. at 201. If a court were to skip this initial step, "[t]he law might be deprived of this explanation," *Id.*, thereby inhibiting the development of Fourth Amendment law. *See Robinson*, 278 F.3d at 1012. It is therefore necessary to first consider the constitutional inquiry. Only if the court determines that Plaintiff's Fourth Amendment rights were violated will the court address the immunity issue. *Johnson*, 340 F.3d at 794-95; *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151.

The court notes that at this stage in the proceedings, the allegations contained in the complaint are viewed in the light most favorable to the Plaintiffs. Viewing the facts in this light, Plaintiffs have properly alleged violations of clearly established constitutional rights. *See Kaupp v. Texas*, 538 U.S. 626, 630 (2003) (requiring probable cause to effectuate a seizure); *Graham v. Connor*, 490 U.S. 386, 396-99 (1989) (discussing the Fourth Amendment right to be free from *unreasonable* seizures). Whether or not Jillian's arrest lacked probable cause or was effectuated by using excessive force cannot be determined at this time. Accordingly, the court cannot say at this time that Defendant Underhill is entitled to qualified immunity.

Defendants Sheppard and Mieras as supervisory officials "can be held liable under section 1983 'only if they play an affirmative part in the alleged deprivation of constitutional rights.'" *Graves v. City of Coeur D'Alene*, 339 F.3d 828, 848 (9th Cir. 2003) (quoting *Rise v. Oregon*, 59 F.3d 1556, 1563 (9th Cir. 1995)). "Supervisory liability is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivations of which the complaint is made; or for conduct that showed a reckless or callous indifference to the rights of others." *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991) (internal quotations and citations omitted). In their complaint, Plaintiffs allege that their rights were violated because Defendants implemented discriminatory procedures, policies, and customs. Therefore, at this time, the court cannot say that Plaintiffs will be unable to offer facts to prove that Sheppard and Mieras were responsible for the alleged Fourth Amendment violations. Similarly, the court cannot determine whether Sheppard and Mieras are entitled to qualified immunity at this time as it is not clear what role, if any, these defendants played in the

1 alleged violations.

2 Also, the court is cognizant of Defendants' arguments made pursuant to *Heck v.
3 Humphrey*, 512 U.S. 477, 486-87 (1994). Specifically, Defendants argue that a favorable
4 judgment on Plaintiffs' section 1983 claim would imply that any proceedings against Jillian upon
5 on her trespassing violation are invalid. Therefore, Defendants argue that *Heck*'s protections
6 against such collateral attacks serve as a bar to one or more of Plaintiffs' section 1983 claims. At
7 this stage of the proceedings, the facts relative to a *Heck* argument are not clearly before the
8 court. For this reason, the court will reserve ruling on this issue at this time.

      2.    *Procedural Due Process*

10 Plaintiffs' third claim for relief alleges that Defendants Sheppard and WCSD violated
11 Jillian's right to free public education as secured by the Due Process Clause of the Fourteenth
12 Amendment.[9] Specifically, Plaintiffs allege that Jillian was suspended from Hug High School
13 without being informed of the evidence against her or her appeal rights and without being given
14 the right to a timely hearing. Defendants contend this claim should be dismissed because Jillian
15 was provided a hearing on April 18, 2005, nearly a month after her suspension. In addition,
16 Defendants argue that Jillian was not deprived of a free public education because she eventually
17 graduated and that her claim is barred by administrative estoppel.[10]

18 Defendants' argument that Jillian could suffer no harm because she was given an
19 administrative hearing a month after her suspension is not persuasive to this court. The
20 substance of Plaintiffs' allegations is that she was suspended prior to receiving notice and an
21 opportunity to be heard, both of which were required by law. *See Goss v. Lopez*, 419 U.S. 565,

---

[9] The court notes that although this claim for relief is brought pursuant to 42 U.S.C. § 1983, it is not subsumed by Title VI as Title VI was not intended to remedy such conduct. *See* part A(1)(a) above.

[10] The court notes that eventual graduation does not mean that Jillian's procedural due process rights were not violated. If she was improperly removed from school, she suffered an injury that is not mitigated by the fact that she eventually graduated. Further, although Defendant's claim of administrative estoppel may have merit, the court will refrain deciding that issue at this time, as the facts relevant to that history are not properly before the court on a motion to dismiss.

584 (1975) (finding that suspensions of less than 10 days are subject to the requirements of due process and noting that longer suspensions "may require more formal procedures); Nev. Rev. Stat. 392.467(2) ("no pupil may be suspended or expelled until he has been given notice of the charges against him, an explanation of the evidence and an opportunity for a hearing . . ."). Plaintiffs specifically allege that Jillian was "suspended in excess of ten days without being informed of the evidence against her, without being informed of her appeal rights, and without being given the right to a timely hearing. . . ." Compl. 12.  Such allegations are sufficient to allege a due process violation.

Further, while the court is aware of Defendants argument that the findings made at the administrative hearing should be given the effect of *res judicata*, the court will reserve ruling on this issue at this time.  Neither party has sufficiently briefed the issue of administrative estoppel to allow the court to reach a decision at this time and the court is reluctant to consider matters outside of the pleadings on a motion to dismiss.

**B.  State Law Claims**

In addition to the federal claims discussed above, Plaintiffs also bring state law claims alleging battery, false imprisonment, intentional infliction of emotional distress, negligent infliction of emotional distress, negligent supervision and training, and violation of administrative regulations.

Defendants argue they are entitled to immunity on these claims pursuant to Nevada Revised Statute section 41.032.  Specifically, Defendants argue the actions of all Defendants were discretionary acts that cannot form the basis for a lawsuit in Nevada.

Section 41.032(2) of the Nevada Revised Statutes provides as follows:

> no action may be brought under NRS 41.031 or against an immune contractor or an officer or employee of the State or any of its agencies or political subdivisions which is: [b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the State or any of its agencies or political subdivisions or of any officer, employee or immune contractor or any of these, whether or not the discretion involved is abused.

Nev. Rev. Stat. § 41.032.  "Discretionary acts are those which require the exercise of personal deliberation, decision and judgment." *Travelers Hotel, Ltd. v. City of Reno*, 741 P.2d 1353, 1354

1  (Nev. 1987) (citing *Parker v. Mineral County*, 729 P.2d 491, 493 (Nev. 1986)).  An action can be
2  brought, however, if the acts in question are merely "'ministerial,' amounting only to obedience
3  to orders, or the performance of a duty in which the officer is left no choice of his own." *Maturi*
4  *v. Las Vegas Metro. Police Dep't*, 871 P.2d 932, 934 (Nev. 1994).

     *1. State Claims Arising Directly From Arrest*

6       The Nevada Supreme Court has specifically concluded that a police officer's decision to
7  make a traffic stop and arrest a person for failing to sign a traffic ticket are discretionary acts
8  because they require the officer to use his judgment.  *Ortega v. Reyna*, 953 P.2d 18, 23 (Nev.
9  1998).  In the present case, Underhill used his discretion to determine when to detain Plaintiffs
10 and how to treat them once detained.  *See Maturi v. Las Vegas Metro. Police Dep't*, 871 P.2d
11 932, 933 (Nev. 1994) (holding officer's decision to handcuff suspect behind back instead of in
12 front despite complaints of medical problems was discretionary).  Accordingly, all state law
13 claims arising directly out of Plaintiffs' detention by Underhill are dismissed under Nevada's
14 state immunity law.  These claims are battery, false imprisonment, intentional infliction of
15 emotional distress and negligent infliction of emotional distress.

     *2. Negligent Supervision and Training*

17      This court has held that the supervision and training of employees is not a discretionary
18 act subject to immunity under Nevada Revised Statute 41.032.  *Herrera v. Las Vegas Metro.*
19 *Police Dep't.*, 298 F.Supp.2d 1043, 1054-55 (D. Nev. 2004).  In addition, viewing the complaint
20 in the light most favorable to Plaintiffs, the court cannot say that a claim for negligent
21 supervision and training has not been stated.  Plaintiffs have alleged that previous incidents
22 occurred which demonstrated to Defendants that they were negligent in their supervision or
23 training of Underwood.  As such, Plaintiffs have pled the minimal requirements of the tort.  *See*
24 *Hall v. SSF, Inc.*, 930 P.2d 94, 99 (Nev. 1996) (noting that an "employer has a duty to use
25 reasonable care in the training, supervision, and retention of his or her employees to make sure
26 that the employees are fit for their position").
27 ///
28 ///

1     *3. Violation of Administrative Regulations*

2            Plaintiffs bring this claim pursuant to WCSD Administrative Regulation 5144.21 and

3     5144.16.[11]  The WCSD Administrative Regulations do not provide an explicit private right of

4     action for violations of their requirements.  However, in certain circumstances courts will imply a

5     private right of action into a statutory scheme.  *See Cort v. Ash*, 422 U.S. 66, 78 (1975) (noting

6     the four factors to consider when determining whether a private right of action should be implied

7     are (1) whether the plaintiff was one of the class for whose special benefit the statute was

8     enacted; (2) whether there was an indication of legislative intent to create or deny such a remedy;

9     (3) whether the remedy was consistent with the underlying purposes of the legislative theme; and

10    (4) whether the cause of action was one traditionally relegated to state law so that it would be

11    inappropriate to infer a cause of action based solely on federal law)[12]; *see also Sports Form, Inc.*

12    *v. LeRoy's Horse & Sports Place*, 823 P.2d 901, 902 (Nev. 1992) (noting the factors in *Cort* are

13    helpful for determining private right of actions in state statutes as well).

14           In this matter Plaintiffs are part of the class for which the regulations were created.

15    However, it is clear that the regulations do not contemplate a private cause of action for damages

16    arising out of a failure to follow the regulations and that such a remedy would be inconsistent

17    with the goal of the regulations; namely encouraging the school district and its students to work

---

[11] WCSD Regulation 5144.16 requires the school district to notify students facing a long-term suspension of their right to an appeals process.  As the underlying rationale for this regulation is not significantly different than that discussed for Regulation 5144.21, the court adopts its reasoning for Regulation 5144.21 to cover Regulation 5144.16.

[12] Some courts consider the *Cort* four factor test to be implicitly overruled and reduced to a single factor test seeking to determine the congressional intent behind a statute.  *See Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 308 (6th Cir. 2000).  However, the Ninth Circuit - although recognizing the potential conflict between *Cort* and subsequent Supreme Court cases - and the Nevada Supreme Court still consider the full four factor test relevant to determining if a private right of action exists.  *See First Pac. Bancorp, Inc. v. Helfer*, 224 F.3d 1117, 1121-22 (9th Cir. 2000).  Thus, the four factor test is the appropriate test for determining whether a private right of action exists in an action governed by Nevada state law.

together and within the system to resolve grievance disputes based on perceived discrimination.[13] In fact, the regulations provide an alternative avenue to the court system, without foreclosing that option, by which an aggrieved may attempt to resolve disputes. In essence, the school district gives individuals the ability to resolve their problems internally if they wish, without mandating that they give up their legal rights. When weighed in this light, the relevant factors discussed in *Cort* do not imply a private right of action in the WCSD Administrative Regulations that would allow an aggrieved student to sue the WCSD based on a violation of those regulations. Accordingly, Plaintiffs' claim for relief must be dismissed.

It is therefore ORDERED that the Defendants' Motion to Dismiss (#11) is GRANTED in part and DENIED in part as discussed above.

DATED this 16th day of February, 2006.

_____
LARRY R. HICKS
United States District Judge

---

[13] The regulation provides a brief note on its purpose and scope, stating: "The best solutions are those that involve input from those closest to the concern. . . . At any time, a student may choose to initiate the following grievance procedure along with having the legal right to file a grievance with . . . a court of competent jurisdiction. . . ." WCSD Reg. 5144.21 at 3. Thus, the grievance procedure is designed as an alternative to litigation in the courts with the purpose of using those closest to the situation to work out an amicable solution outside of the court system.