UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| GAYLE CHILES, an individual; et al., Plaintiffs, v. GARY UNDERHILL, in his official capacity; et al., Defendants. | 03:05-CV-00179-LRH-RJJ <br> ORDER |

Presently before the court are cross-motions for summary judgment. First, Plaintiffs, Jillian Chiles and Gayle Chiles (collectively, "Plaintiffs"), filed a Motion for Partial Summary Judgment (# 46[1]) on January 25, 2007. Defendants, Gary Underhill, Mike Mieras, Edward Shepard, and the Washoe County School District (collectively, "Defendants") filed an opposition (# 79), and Plaintiffs replied (# 85).

Defendants filed their Cross-Motion for Summary judgment (# 59) on July 11, 2007. Plaintiffs have filed an opposition (# 86), and Defendants subsequently replied (# 87).

**I. Factual Background**

This case arises out of an allegedly unlawful detention and arrest at Hug High School ("HHS"), a school within the Washoe County School District ("WCSD"). Plaintiff Gayle Chiles

[1]Refers to the court's docket number.

("Gayle") is Caucasion and the mother of Jillian Chiles ("Jillian"). Jillian is African American and formerly attended HHS.

During the 2004-2005 school year, HHS had problems with grafitti, vandalism, drugs and gang activity. (Exhibits (## 61-78), Dep. of Tom Kallay, Ex. 8 at 37:20-38:23; Dep. of Gary Underhill, Ex. 10 at 79:8-20, 178:2-6.) To address safety concerns, HHS adopted a "fifteen-minute rule." (Exhibits (## 61-78), Dep. of Tom Kallay, Ex. 8 at 37:20-39:1.) Pursuant to the rule, students had fifteen minutes to get to their after-school activities or to vacate the campus. *Id*. at 39:1-6. Students who violated the rule could be considered trespassing. *Id*. at 7-17.

In March, 2005, Jillian had four classes in the morning and no classes after the lunch period. (Pls.' Mot. for Partial Summ. J. (# 46), Aff. of Jillian ¶ 3.) On March 15, 2005, school police officer Underhill issued Jillian a trespass warning as she was returning from lunch. *Id*. ¶ 5. Jillian asked why she was being issued a warning. (Exhibits (## 61-78), Dep. of Jillian, Ex. 3 at 151:25-152:1.) Underhill told Jillian that Dean of Discipline Edward Shepard had made the decision. *Id*. at 152:3-9. Underhill further told Jillian she had to leave and that he would arrest her if he saw her back on campus. *Id*. at 155:25-156:18, 173:7-8. Jillian left campus after this incident. *Id*. at 156:23-157:1.

On the same date, Jillian had previously made plans to go shopping with a friend after school. (Pls.' Mot. for Partial Summ. J. (# 46), Aff. of Jillian ¶ 6.) At approximately 2:30 p.m., Jillian returned to the school parking lot to meet her friend. (Exhibits (## 61-78), Dep. of Jillian, Ex. 3 at 167:4-168:21.) Jillian stood in the parking lot with some of her friends and then noticed Underhill. *Id*. at 172:11-17.

Jillian panicked and asked her friends what she should do. *Id*. at 172:22-23. Her friends told her to "go," and Jillian walked to the sidewalk near the school. *Id*. at 172:24-173:20. Jillian saw Underhill riding his bike toward her and she ran across the street. *Id*. at 173:23-174:3. Underhill reached Jillian on the other side of the street, threw her down, and handcuffed her. (Pls.'

Mot. for Partial Summ. J. (# 46), Aff. of Jillian ¶ 9.) A crowd of students gathered and Officers Price and Calderon arrived to assist Underhill. (Exhibits (## 61-78), Dep. of Jillian, Ex. 3 at 180:4-25; Decl. of Price, Ex. 15 ¶ 15; Decl. of Calderon, Ex. 14 ¶ 8.) While the officers were restraining Jillian, Jillian kicked the officers and threatened to spit on them. (Exhibits (## 61-78), Dep. of Jillian, Ex. 3 at 178:4-6, 183:23-25; Decl. of Price, Ex. 15 ¶ 15; Decl. of Calderon, Ex. 14 ¶ 9, 11.) The officers placed a "spit-hood" on Jillian's head to prevent her from spitting on them. (Exhibits (## 61-78), Decl. of Calderon, Ex. 14 ¶ 11.) The officers also secured Jillian's legs with a hobble due to her kicking. *Id*. The officers then took Jillian to to a juvenile facility where Gayle picked her up a few hours later. (Exhibits (## 61-78), Dep. of Gayle, Ex. 1at 49:3-50:18.)

Jillian was sent a notice of an emergency suspension from HHS on March 15, 2005. (Exhibits (## 61-78), Notice of Suspension, Ex. 2.) The emergency suspension informed Gayle that she must contact Eddie Bonine ("Bonine") to schedule a conference before Jillian would be readmitted to school. *Id*. Gayle called Bonine's office to arrange a meeting. (Pls.' Mot. for Partial Summ. J. (# 46), Aff. of Gayle ¶ 2.) The meeting was scheduled for April 13, 2005, due to Bonine's busy schedule. *Id*. However, the meeting was later rescheduled for April 5, 2005. *Id*. ¶ 3.

In a memorandum dated March 18 2005, Bonine referred Jillian's disciplinary matter to Debbie Feemster ("Feemster") due to Feemster's apparent belief that Bonine did not handle cases involving African-American students appropriately. (Exhibits (## 61-78), March 18, 2005, Memorandum, Ex. 18A.)

On April 4, 2005, Gayle learned the April 5, 2005, meeting was cancelled. (Pls.' Mot. for Partial Summ. J. (# 46), Aff. of Gayle ¶ 4.) In a letter to Jillian's attorney dated April 4, 2005, general counsel for the school district proposed to suspend Jillian for fifty-nine school days. (Pls.' Mot. for Partial Summ. J. (# 46), April 4, 2005, Letter, Ex. 9.) The letter informed Jillian's counsel the decision could be appealed. *Id*. The letter further indicated Jilian could begin attending

Washoe High School. *Id.* Jillian transferred to Washoe High School on or about April 6, 2005. (Exhibits (## 61-78), WCSD Enrollment Form, Ex. 4.)

On April 18 and April 20, 2005, Jillian had a hearing that was conducted by hearing officer Patrick D. Dolan ("Dolan"). (Exhibits (## 61-78), Decl. of Dolan, Ex. 4 ¶ 2.) Dolan issued his decision on April 27, 2005. *Id.* ¶ 3. Dolan found the long-term suspension of Jillian was for the benefit of the welfare of the school and WCSD." (Exhibits (## 61-78), Findings of Fact, Conclusions of Law and Decision, Ex. 4 at 37.) Dolan further found that WCSD failed to have an informal hearing on the emergency suspension "as soon as practicable." *Id.* at 38.

**II. Legal Standard**

Summary judgment is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001). For those issues where the moving party will not have the burden of proof at trial, the movant must point out to the court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.,* 477 U.S. at 325.

In order to successfully rebut a motion for summary judgment, the non-moving party must point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient to establish a genuine dispute; there must be evidence on which the jury could reasonably find for the plaintiff. *See id.* at 252.

**III. Discussion**

Defendants seek summary judgment on all remaining causes of action. Plaintiffs seek summary judgment on their Fourth Amendment claim and their Procedural Due Process claim. The court will address each claim for relief separately.

**A. The Fourth Amendment**

Jillian's first cause of action alleges a violation of her Fourth Amendment rights. Specifically, Jillian alleges she was arrested without probable cause or reasonable suspicion and that excessive force was used. (Am. Compl. (# 6) ¶ 41.) Defendants seek summary judgment arguing probable cause existed to arrest Jillian and that there is no evidence of excessive force. In opposing summary judgment, Plaintiffs argue there was no probable cause to arrest Jillian.

The evidence presented in this case demonstrates Underhill is the officer that arrested Jillian and allegedly used excessive force. In fact, Underhill is the only school police officer who is a party to this action. Thus, Underhill, in his individual capacity, is the defendant who would be liable for the alleged Fourth Amendment violations. Subsequent to the filing of the present

motion, the parties have stipulated (## 88, 89) to the dismissal of Underhill in his individual capacity while keeping Underhill as a defendant in his official capacity. In light of this stipulation, Jillian's's Fourth Amendment claim is no longer viable. *See Hafer v. Melo*, 502 U.S. 21, 25(1991) (distinguishing personal capacity and official capacity actions).

However, to the extent the actions of Underhill were based on an official custom or policy, a cause of action may still exist. An official-capacity suit represents another way of pleading an action against the entity of which the officer is an agent. *Id*. "Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, 'the entity's policy or custom must have played a part in the violation of federal law.'" *Id*. (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). Whether or not a custom or policy exists is addressed below.

**B. Custom or Policy**

Defendants argue there was no official policy or longstanding practice or custom for purposes of a *Monell* claim. In addition, Defendants argue there was no injury or constitutional violation that would support such a claim. Plaintiffs oppose summary judgment arguing the fifteen-minute rule was an unlawful policy. Plaintiffs further argue WCSD's discriminatory practices were the moving force behind the constitutional injuries of plaintiffs.

A local government may be sued under § 1983 when an injury is inflicted as a result of the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy. . . ." *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 694 (1978). Similarly, "[a] supervisor may be held liable under § 1983 if he or she was personally involved in the constitutional deprivation or a sufficient causal connection exists between the supervisor's unlawful conduct and the constitutional violation." *Jackson v. City of Bremerton*, 268 F.3d 646, 653 (9th Cir. 2001) (citations omitted). No liability exists under § 1983 where no injury or constitutional violation occurred. *Id.*

Plaintiffs first argue the fifteen-minute rule constituted an unlawful policy. Specifically,

Plaintiffs argue Jillian had a right to be at HHS because she was not suspended and the regulations define trespassing as being on school property while under suspension from school. Plaintiffs further argue the fifteen-minute rule required board approval that was never received.

Section 393.410 of the Nevada Revised Statutes makes it unlawful for any person "purposely and maliciously to commit any trespass upon the grounds attached to a public schoolhouse, or any fixtures placed thereon, or any enclosure or sidewalk about the same." Nev. Rev. Stat. § 393.410. WCSD Regulation 5144.1 defines trespass as follows: "[t]o be upon the property of another without permission of the owner and to stay upon same after warning. To be on school property or at a school function while under suspension from school." WCSD Admin. Reg. 5144.1.

The court finds HHS had the authority to enact the fifteen- minute rule. The regulations define trespass in two ways. First, trespass can occur when a person is on the property of another without permission of the owner and to stay upon that property after warning. WCSD Admin. Reg. 5144.1. Second, a trespass can occur when a person is on school property or at a school function while under suspension from school. *Id*.

Section 391.210 of the Nevada Revised Statutes provides, "[t]he board of trustees of a school district may direct the administrators, principals, teachers and other licensed personnel employed by them to exercise such powers and authority in the schools as the board of trustees has under this title of NRS." Nev. Rev. Stat. § 391.210. WCSD Regulation 5144 explicitly gives the principal "the overall responsibility for the discipline and welfare of the student." WCSD Admin. Reg. 5144. The regulations further provide, "[e]ach principal shall develop or revise rules applicable to conditions in that particular school and in accordance with the administrative regulations." *Id*.

In accordance with this responsibility, HHS adopted the fifteen-minute rule to address safety concerns. *See* (Exhibits (## 61-78), Dep. of Tom Kallay, Ex. 8 at 37:20-39:1.) Thus, the

fifteen-minute rule addresses the first definition of trespass and defines under what circumstances a student can be on the property of HHS. In other words, the fifteen-minute rule provides that HHS would only consent to giving students fifteen minutes to get to their after-school activities or to vacate the campus. *See id.* at 39:1-6. Thus, the court finds that HHS and Principal Kallay had the authority to enact the fifteen-minute rule.

Plaintiffs next argue Jillian had a contractual right to be at school. Plaintiffs rely on *A.E.B. v. State*, 756 N.E.2d 536, 540 (Ind. Ct. App. 2001), to support this position. In that case, a Juvenile appealed a finding of criminal trespass to the Indiana Court of Appeals. *Id.* The Juvenile argued the Indiana Constitution coupled with Indiana's compulsory attendance law provided her with a contractual interest in the school property. *Id.* For purposes of the decision, the Indiana Court of appeal assumed, without deciding, that a contractual interest existed. *Id.* Nevertheless, the court found the juvenile violated whatever contract may have existed by interfering with educational activities at the school. *Id.* The court stated, "'[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.'" *Id.* at 540-41 (quoting *Grody v. State*, 278 N.E.2d 280, 284 (Ind. 1972)).

Plaintiffs have provided no Nevada authority indicating students have a contractual right to be at school. However, even if a contractual right to be at HHS exists, such a right would only exist to the extent students are present on school property for educational purposes. As noted by the *A.E.B.* court, the State has the power to preserve the property under its control for the use to which it is lawfully dedicated. *Id.* In this case, HHS lawfully enacted the fifteen-minute rule. Thus, any contractual interest in being present on school property extinguished fifteen-minutes after Jillian's lunch period. As such, the fifteen-minute rule does not constitute an unlawful custom or policy.

As further evidence of a custom or policy, Plaintiffs cite to the deposition of Underhill. During his deposition, Underhill indicated he was told, and agreed, that the school police had to

regain control of the school. (Pls.' Opp'n to Defs.' Mot. for Summ. J. (# 86), Dep. of Gary Underhill, Ex. 25 at 79:1-15.) The court finds this statement insufficient as evidence of a custom or policy. The fact Underhill was told that school police had to regain control of the school does not suggest that control would be regained at the expense of constitutional rights. To put this statement in context, Underhill indicated that the school had problems in terms of drugs, gang activity, fights and that it was not a positive learning environment. *Id*. at 79:1-23. Thus, Underhill took the personal view that he would enforce the rules strictly and make arrests rather than citations. *Id*. at 76:8-13. In short, nothing in Underhill's deposition testimony indicates a custom or policy of making unlawful arrests or using excessive force.

Plainiffs next cite the deposition testimony of Feemster. Feemster indicated she had seen certain individuals treat students of color unfairly. (Pls.' Opp'n to Defs.' Mot. for Summ. J. (# 86), Dep. of Feemster, Ex. 22 at 51:11-18.) However, Feemster further stated, "it could be [due] to lack of education. I don't think people do things deliberately, I would hope not." *Id*. at 51:21-23. Thus, Feemster's statement is not evidence of a custom or policy.

Plaintiffs next request the court to take judicial notice of actions pending before the court involving allegations Underhill illegally arrested other African-American students. Plaintiffs' request for judicial notice will be denied on the basis of relevance. The fact Plaintiffs' counsel has filed similar actions against Underhill containing allegations of unlawful arrests does not indicate WCSD has an official policy or custom regarding such a practice. There is no evidence Underhill was responsible for creating the official policy or custom of WCSD. Furthermore, there is no evidence indicating Underhill treated non-African-American students differently.

Finally, Plaintiffs argue the superintendent was aware of the problems at HHS but took no action. Plaintiffs have presented evidence indicating superintendent Paul Dugan ("Dugan") was familiar with several complaints against Underhill. (Pls.' Opp'n to Defs.' Mot. for Summ. J. (# 86), Dep. of Dugan, Ex. 6 at 78:4-7.) However, the evidence further shows Dugan had discussions

with personnel concerning these complaints. *Id*. at 78:8-10. Thus, there is no evidence Dugan failed to take action or that any unlawful custom or policy existed at HHS. For these reasons, the court finds no evidence of a custom or policy. Summary judgment will be granted in favor of Defendants.

**C. Procedural Due Process**

Plaintiffs' third cause of action sets forth a claim for a violation of procedural due process. Defendants seek summary judgment on this claim arguing it is barred on the basis of administrative estoppel. Alternatively, Defendants argue Plaintiffs failed to show substantial prejudice. Plaintiffs also seek summary judgment arguing Jillian was denied any type of hearing on the short-term suspension. Plaintiffs further argue that a post-suspension hearing on the long-term suspension was not held in a timely manner.

Nevada has created a property interest in a student's entitlement to a public education. *See* Nev. Const. art. XI, § 2. In *Goss v. Lopez*, 419 U.S. 565 (1975), the Supreme Court articulated what procedure is due before a student can be suspended for a short period of time.

> Students facing temporary suspension have interests qualifying for protection of the Due Process Clause, and due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story.

*Id*. However, the Supreme Court explained there does not need to be a delay between the notice and the time of the hearing. *Id*. at 582. Rather, the student must be informed of the accusations against him and be given an opportunity to explain his version of the facts. *Id*.

There are recurring situations in which prior notice and hearing cannot be insisted upon. *Id*. "Students whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school." *Id*. In such circumstances, the required procedure must occur "as soon as practicable." *Id*.

The court will first address whether Plaintiffs are estopped from asserting their Procedural

Due Process claim. "[A] federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Bd. of Educ.*, 465 U.S. 75, 81 (1984). The Nevada Supreme Court has held res judicata may apply to administrative proceedings. *Britton v. City of North Las Vegas*, 799 P.2d 568, 569 (Nev. 1990). Under the doctrine of collateral estoppel, or issue preclusion, a party may be barred from re-litigating an issue of fact or law that was previously decided in a different case. *Allen v. McCurry*, 449 U.S. 90, 94 (1980). In Nevada, collateral estoppel requires a showing of the following three elements:

> (1) the issue decided in the prior litigation must be identical to the issue presented in the current action; (2) the initial ruling must have been on the merits and have become final; and (3) the party against whom the judgment is asserted must have been a party in privity with a party to the prior litigation.

*Kahn v. Morse & Mowbray*, 117 P.3d 227, 235 (Nev. 2005) (citations and internal quotations omitted).

The court is perplexed at Defendants' assertion of collateral estoppel.[2] At the administrative level, the hearing officer determined the short-term suspension was constitutionally defective for failing to hold an informal hearing "as soon as practicable." To the extent issue preclusion applies, the issue of liability has been conclusively established. *See Allen*, 449 U.S. at 94 ("[O]nce a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.")

Regardless of whether collateral estoppel bars relitigation, the court agrees with the hearing officer. The undisputed facts in this case demonstrate a clear violation of Jillian's Procedural Due

---

[2]To the extent Defendants may be attempting to assert claim preclusion, the court finds claim preclusion does not bar Plaintiffs' Due Process Claim. The hearing that occurred in this case occurred to determine the propriety of Jillian's long-term suspension and not whether Jillian's Due Process rights were violated. *See* WCSD Admin. Reg. 5144.16(3).

Process rights. The evidence in this case shows Jillian was subject to both a short-term suspension, (Exhibits (## 61-78), Notice of Suspension, Ex.2) (ten-day suspension), and a long-term suspension, (Pls.' Mot. for Partial Summ. J. (# 46), April 4, 2005, Letter, Ex. 9) (fifty-nine day suspension). It is undisputed Jillian did not receive notice and a hearing before the short-term suspension. Nevertheless, under the circumstances of the case, WCSD had the authority to remove Jillian due to the presence of a continuing danger. Specifically, Jillian had just been arrested for trespassing and was kicking and resisting the arresting officers.

Even though a pre-suspension hearing was not necessary for the short-term suspension, WCSD was still required to give Jillian notice and an opportunity to be heard as soon as practicable. *See Goss*, 419 U.S. at 582. Notice of the short-term suspension was given on or about March 15, 2005. (Exhibits (## 61-78), Notice of Suspension, Ex.2.) Nevertheless, WCSD did not afford Jillian an opportunity to be heard. In fact, Jillian did not have any sort of hearing until the Dolan hearing on April 18 and April 20, 2005. *See* (Exhibits (## 61-78), Decl. of Dolan, Ex. 4 ¶ 2.) As Jillian did not receive a hearing until well after the short-term suspension was over, WCSD violated her Due Process rights.

Even with the violation found by the court, Defendants argue summary judgment in favor of Jillian is inappropriate because there is no proof of substantial prejudice. Defendants rely on *Watson v. Beckel*, 242 F.3d 1237 (10th Cir. 2001). *Watson* involved a student that was expelled from a state military academy for assaulting a fellow student. *Id*. at 1238-39. The student filed a § 1983 action alleging a violation of due process on the basis of inadequate notice. *Id.* at 1240. The student argued, in part, that he was not told he was charged with racism. *Id*.

In analyzing the issue, the *Watson* court stated, "[i]n order to establish a denial of due process, a student must show substantial prejudice from the allegedly inadequate procedure." *Id*. at 1242. The court found the student had not been prejudiced because he admitted to assaulting his fellow student due to that student's race. *Id.* Thus, the court concluded additional notice would

not have allowed the student to better defend against the allegations. *Id*.

The parties have cited no authority as to whether the Ninth Circuit requires a showing of substantial prejudice. Furthermore, the Supreme Court in *Goss* did not indicate such a showing is necessary. Nevertheless, even if a showing of substantial prejudice is required, the court finds Jillian did suffer substantial prejudice in this case. With respect to the short-term suspension, Jillian did not have an opportunity to be heard until the suspension was already complete. Thus, the punishment had already taken place before the student received due process. The court finds this deprivation amounts to substantial prejudice.

Finally, the court finds there is no evidence of a due process violation as a result of the long-term suspension. Plaintiffs argue the delay that occurred in this case violated Jillian's Due Process rights. Plaintiffs have provided no authority to support this argument. Plaintiffs received notice of the long-term suspension on or about April 4, 2005. (Pls.' Mot. for Partial Summ. J. (# 46), April 4, 2005, Letter, Ex. 9.) The letter informed Jillian's counsel that the decision could be appealed. *Id*. In fact, the decision was appealed and a hearing occurred on April 18 and April 20, 2005. *See* (Exhibits (## 61-78), Decl. of Dolan, Ex. 4 ¶ 2.) The court finds no violation on account of the delay between the notice and the hearing.[3]

For the foregoing reasons, the court will grant partial summary judgment in favor of Plaintiffs with respect to the short-term suspension. However, summary judgment was only sought with respect to liability. Therefore, a trial will be necessary to determine damages.

**D. Title VI**

Plaintiffs' second cause of action alleges a violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. Defendants seek summary judgment arguing there is no evidence of intentional race discrimination. Alternatively, Defendants argue there is no evidence linking

---

[3] Defendants also argue that the individual Defendants are entitled to qualified immunity because no constitutional violation occurred. However, this argument is untenable in light of the court's finding that Jillian's Due Process rights were violated.

federal funding to any discriminatory act. Plaintiffs oppose summary judgment arguing there is sufficient evidence of intentional discrimination and the requisite federal funding.

Title VI provides, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. 2000d. This provision creates a private right of action for both injunctive relief and damages. *Alexander v. Sandoval*, 532 U.S. 275, 279 (2001). To state a claim for damages under Title VI, a plaintiff must allege that (1) the entity involved is engaging in racial discrimination, and (2) the entity involved is receiving federal financial assistance. *Fobbs v. Holy Cross Heath Sys. Corp.*, 29 F.3d 1439, 1447 (9th Cir. 1994), *overruled on other grounds by Daviton v. Columbia/HCA Healthcare Corp.*, 241 F.3d 1131 (9th Cir. 2001). Discrimination must be intentional in order to be actionable under Title VI. *Sandoval*, 532 U.S. at 280. In addition, a plaintiff must prove that he is an intended beneficiary of the federally-funded program at issue. *The Epileptic Found. v. City and County of Maui*, 300 F.Supp.2d 1003, 1011 (D. Haw. 2004) (citing *Wrenn v. Kansas*, 561 F.Supp. 1216, 1212 (D. Kan. 1983)).

Looking at the evidence in the light most favorable to Plaintiffs, the court finds no evidence of intentional discrimination. To establish discriminatory intent, Plaintiffs first argue seventy-five percent of the student body at Hug High School consists of minorities. Although Plaintiffs are correct that Hug High School is largely composed of minority students, (Pls.' Opp'n to Defs.' Mot. for Summ. J. (# 86), Dep. of Paul Dugan, Ex. 6 at 80:9-15), such statistics do not suggest intentional discrimination.

Similarly, as discussed above, Underhill's statement regarding the school police regaining control of the school, (Pls.' Opp'n to Defs.' Mot. for Summ. J. (# 86), Dep. of Gary Underhill, Ex. 25 at 79:1-15), does not show intentional discrimination. Nothing in Underhill's statement indicates that school police were treating students differently on account of their race.

Rather, Underhill's statement was a response to problems that were occurring at Hug High School.

Plaintiffs also argue several instances of discrimination occurred and were sanctioned by the administration in the 2003-2004 school year. Patrick McGuire ("McGuire"), a teacher, testified that a vice-principal by the name of Redmond singled out Hispanic and African-American students for suspensions. (Pls.' Opp'n to Defs.' Mot. for Summ. J. (# 86), Dep. of Patrick McGuire, Ex. 23 at 15:3-12, 22:3-6, 85:3-14.) This testimony fails to create a genuine issue of material fact. McGuire's testimony does not identify any individual other than Redmond that discriminated against minority students. Furthermore, there is no evidence concerning whether Redmond is still employed at Hug High School. Finally, there is no evidence that Redmond was involved with any decision regarding Jillian.

Plaintiffs next rely on the testimony of Feemster. As previously discussed, Feemster indicated she had seen certain individuals treat students of color unfairly. (Pls.' Opp'n to Defs.' Mot. for Summ. J. (# 86), Dep. of Feemster, Ex. 22 at 51:11-18.) This testimony fails to establish a genuine issue of material fact because Feemster explicitly opined the discrimination was not deliberate. *Id*. at 51:21-23.

Plaintiffs also rely on the double-hearsay statement of Feemster who was told by a teacher's aide that a teacher allegedly said, "they need to get rid of all black kids." *Id*. at 57:12-16. This double-hearsay statement is inadmissible and cannot be considered in a motion for summary judgment. *See* Fed. R. Evid. 801, 802; *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment.") Even if this statement were admissible, it fails to show the actions taken against Jillian were intentionally discriminatory. There is no indication the teacher who allegedly made the statement at issue played any role in the events of this case.

Plaintiffs next rely on the deposition testimony of Dugan. As discussed above, Plaintiffs have presented evidence indicating Dugan was familiar with several complaints against Underhill.

(Pls.' Opp'n to Defs.' Mot. for Summ. J. (# 86), Dep. of Dugan, Ex. 6 at 78:4-7.) However, the evidence further shows Dugan had discussions with personnel concerning these complaints. *Id.* at 78:8-10. Thus, there is no evidence Dugan failed to take action.

Finally, Plaintiffs argue WCSD had a dropout prevention policy that was not applied to African-American students. It is undisputed that "graduation specialists" contact students that have failed one or more classes and have had one or more absences. Furthermore, there is evidence indicating Jillian was not contacted by a graduation specialist. (Pls.' Opp'n to Defs.' Mot. for Summ. J. (# 86), Aff. of Gayle, Ex. 10 ¶ 10.)

Once again, the court finds this evidence insufficient to suggest intentional discrimination. The fact Jillian was not contacted by a graduation specialist is not, by itself, evidence of discrimination. Plaintiffs have provided no evidence as to whether other, non-African-American, students were contacted by the graduation specialist. It is certainly possible the graduation specialist failed to contact students of all races. Without evidence indicating African-American students were denied contact with the graduation specialist while other non-African-American students had such contact, the court cannot say that the failure to contact Jillian is evidence of intentional discrimination.

**E. Negligent Supervision and Training**

Plaintiffs' eighth cause of action states a claim for negligent supervision and training. Defendants seek summary judgment arguing there is no evidence Underhill was unfit for his job. Defendants further argue there is no evidence of antecedent events that would have given WCSD pause in hiring any of the defendants. Plaintiffs oppose summary judgment arguing that evidence shows the hiring of Underhill was negligent.

"'The tort of negligent hiring imposes a general duty on the employer to conduct a reasonable background check on a potential employee to ensure that the employee is fit for the position.'" *Hall v. SSF, Inc.*, 930 P.2d 94, 98 (Nev. 1996) (quoting *Burnett v. C.B.A. Sec. Serv.*,

820 P.2d 750, 752 (Nev. 1991)). "An employer breaches this duty when it hires an employee even though the employer knew, or should have known, of that employee's dangerous propensities." *Id.* (citing *Kelley v. Baker Protective Services, Inc.*, 401S.E.2d 585, 586 (Ga. 1991)). Employers also have a duty to use reasonable care in training, supervision, and retention of his or her employees to make sure that employees are fit for their positions. *Id.* (citing 27 Am. Jur. 2d *Employment Relationship* §§ 475-76 (1996)).

As evidence of negligent hiring, Plaintiffs first rely on the deposition of Underhill. During his deposition, Underhill indicated he had previously applied to the Sparks Police Department. (Pls.' Opp'n to Defs.' Mot. for Sum. J. (# 86), Dep. of Gary Underhill, Ex. 25 at 18:11-12.) Underhill was told he was not hired because he did not pass his "department psych." *Id.* at 19:3-5. However, Underhill later found out he did pass and was not hired due to a personal conflict. *Id.* at 19:6-10.

As an initial matter, Plaintiffs have provided no evidence Underhill actually failed any psychological exam. Underhill's own testimony indicates that Underhill believes he passed the exam. Nevertheless, even if Underhill failed the exam, there is no evidence that the failing of the exam is in any way related to the allegations of unlawful arrest and excessive force in this case. In order for an employer to be liable for negligent hiring, there must be evidence that the employer's negligence caused the alleged injury. *See Hall*, 930 P.2d at 98; *Rockwell v. Sun Harbor Budget Suites*, 925 P.2d 1175, 1226-27 (Nev. 1996). Here, there is no evidence indicating what the psychological exam tests are for or why Underhill allegedly failed the exam. More importantly, Plaintiffs have presented no evidence Underhill was involved with unlawful arrests or excessive force prior to being hired by WCSD. Finally, Plaintiffs have presented no evidence WCSD failed to conduct a reasonable background check.

Plaintiffs next rely on a May 12, 2005, evaluation of Underhill. The evaluation indicates Underhill "needs to transition from a traditional law enforcement agency to a specialized (school

district police) agency." (Pls.' Opp'n to Defs.' Mot. for Summ. J. (# 86), May 12, 2005, Employee Performance Evaluation Report, Ex. 24.) Although this unauthenticated document indicates Underhill needed to make a "transition," it does not demonstrate WCSD was negligent in failing to train Underhill. If anything, the evaluation demonstrates WCSD was working with Underhill to improve his job performance.

Plaintiffs next rely on the deposition testimony of Dugan. As discussed above, Plaintiffs have presented evidence indicating Dugan was familiar with several complaints against Underhill. (Pls.' Opp'n to Defs.' Mot. for Summ. J. (# 86), Dep. of Dugan, Ex. 6 at 78:4-7.) However, the evidence further shows Dugan had discussions with personnel concerning these complaints. *Id.* at 78:8-10. Thus, there is no evidence Dugan failed to take action.

Finally, Plaintiffs state, "an Internal Affairs investigation revealed that Underhill did not follow police procedure." (Pls.' Opp'n to Defs.' Mot. for Summ. J. (# 86) at 22.) However, Plaintiffs have provided no indication as to how this Internal Affairs investigation allegedly shows negligence in the supervision and training of Underhill. Plaintiffs' conclusory assertion is insufficient to defeat summary judgment.

For the foregoing reasons, the court finds Plaintiffs have failed to rebut Defendants' properly supported motion. Summary judgment will be granted.

IT IS THEREFORE ORDERED that Plaintiffs' Motion for Partial Summary Judgment (# 46) is hereby GRANTED.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment (# 59) is hereby GRANTED in part and DENIED in part as set forth in this order.

///

///

///

///

IT IS FURTHER ORDERED that the parties shall have thirty (30) days within which to lodge with the court a proposed written joint pretrial order.

IT IS SO ORDERED.

DATED this 25th day of March, 2008.

LARRY R. HICKS
UNITED STATES DISTRICT JUDGE